Stanley WHITNEY, Plaintiff

v.

WAL–MART STORES, INC., Defendant

No. CIV. 04–38PH.

United States District Court,
D. Maine.

April 4, 2005.

---

Curtis Webber, Linnell, Choate & Webber, LLP, Auburn, ME, for Stanley Whitney, Plaintiff.

Mark V. Franco, Lisa Fitzgibbon Bendetson, Thompson & Bowie, Portland, ME, for Wal–Mart Stores Incorporated, Defendant.

John P. Gause, Augusta, ME, for Disability Rights Center Inc. Disability Rights Center, Amicus.

## CERTIFICATE OF QUESTION OF STATE LAW TO THE SUPREME JUDICIAL COURT OF MAINE SITTING AS THE LAW COURT

HORNBY, District Judge.

The United States District Court for the District of Maine finds that this case involves questions of law of the state of Maine that may be determinative of the cause and that there are no clear controlling precedents thereon in the decisions of the Supreme Judicial Court of Maine sitting as the Law Court.

Accordingly, this court hereby CERTIFIES these questions to the Supreme Judicial Court of Maine sitting as the Law Court and respectfully requests the Law Court to provide instructions concerning such questions of state law pursuant to 4 M.R.S.A. § 57, as amended, and Rule 25 of the Maine Rules of Appellate Procedure.

### PROCEDURAL BACKGROUND

In this case Stanley Whitney sued Wal–Mart in state court for alleged disability and age discrimination in employment and breach of contract. Whitney's second amended complaint seeks relief for discrimination exclusively under the Maine Human Rights Act. It therefore does not raise a federal question under either the Americans with Disabilities Act or the Age Discrimination in Employment Act. Wal–Mart removed the case to this federal court based on diversity of citizenship.

In connection with the summary judgment motion filed by Wal–Mart, which completely resolved all age discrimination and breach of contract claims, the following undisputed facts emerged in connection with Whitney's disability claim.

### STATEMENT OF FACTS

Stanley Whitney was first hired by Wal–Mart on July 31, 1998, as a pricing coordinator and back-up grocery DSD receiver in Melbourne, Florida. Wal–Mart promoted Whitney in February 1999 to be a manager of the sporting goods department of the Melbourne store. Whitney held this position for approximately one year before Wal–Mart transferred him in February 2000 to be the grocery manager at its

store in Indian Harbor Beach, Florida. Whitney worked as grocery manager at this location for approximately 8–10 months. Thereafter, in August 2000, Wal–Mart began training Whitney to become a manager in a tire-lube express ("TLE") department. Between August 2000 and April 2001, Whitney worked as a TLE management trainee at two separate stores, West Melbourne and Merritt Island, Florida. In April 2001, Wal–Mart promoted Whitney to TLE Manager for its Orlando store. With this promotion, Whitney joined the ranks of Wal–Mart's salaried management-level employees, earning $28,500 annually. Whitney continued in this position for three months, working 9 hours per day, 5 days per week, with weekends off.

Whitney decided to leave his position as the TLE Manager in Orlando and accept a demotion in order to return to an hourly associate position at the Merritt Island, Florida, store at the end of June 2001 because he no longer wanted to commute the 70–80 miles to Orlando from his residence on the east coast of Florida. The demotion lost Whitney his salary and his hourly pay rate was set at $10. During a summer vacation in southern Maine in 2001, Whitney learned that Wal–Mart's North Windham store was seeking a TLE Manager. Whitney met the TLE Manager for the district, Michael Swink, expressed an interest in working as the TLE Manager in North Windham, and, approximately two weeks later, Swink offered Whitney the position and a salary of $29,512. Whitney accepted and began working in the North Windham location on October 6, 2001. After starting in North Windham, Whitney worked on average 6 days per week and in excess of 70 hours per week.

Within just over a month, on November 15, 2001, Whitney's health began to deteriorate and Whitney went under a doctor's care following a diagnosis of high blood pressure and possibly serious heart disease. Whitney brought the matter to Wal–Mart's attention with a doctor's note and took a little time off, working only three more days in November. Following visits with his physician's assistant in early December 2001, Whitney was "taken out of work" by his care provider, for reasons related to his heart condition, until he could undergo further testing scheduled for January 2002. Whitney duly completed leave of absence paperwork and submitted it to Wal–Mart. According to Whitney, Swink was displeased with Whitney's request for leave and told Whitney that "this could cost you your job." However, Brett Walters, North Windham's store manager, approved Whitney's request for leave for the dates between November 11, 2001, and January 9, 2002. Whitney subsequently requested an extension to his leave so that he could undergo further testing and Walters approved it, "without comment or hassle."

Whitney remained out of work until January 28, 2002. He returned to work with a "To Whom It May Concern" note from his physician's assistant that "allowed" Whitney to return to work for no more than 8 hours per day and 40 hours per week with two consecutive days off. On February 1, 2002, Whitney had a telephone conversation with Michael Swink, the district TLE manager, who advised Whitney that Swink and Walters had decided that in order for Whitney to return to work as the TLE Manager, he had to be able to work 48–52 hours per week. On February 8, 2002, Whitney and Swink spoke again and Swink indicated that if Whitney could not work 48–52 hours per week, Swink would assist him in locating alternative employment at Wal–Mart.

On February 13, 2002, Whitney brought up the work-hour requirement articulated

by Swink during an "open door" meeting with Kevin Robinson, the district manager, and Hope Gauer, the district assistant. The situation was discussed and it was concluded that Whitney's condition would not prevent him from becoming a non-salaried department manager and receiving $11 per hour in another position. Whitney did not contend at the meeting that he felt he was being discriminated against. Nor did he request that the TLE Manager job be modified to allow him to work 8 hours per day, 5 days per week with 2 consecutive days off. Subsequently, on or about February 15, Gauer notified Whitney that several manager positions were available in Wal–Mart's Biddeford store. Whitney looked into it and notified Gauer that he was interested in three manager positions, in the following order of preference: one in the paper goods and chemical department, one in the pet department and one in "Department 82." Gauer arranged for Whitney to interview with Andre Pepin, then assistant manager of the Biddeford store. Whitney did so but did not receive any of the positions. On February 26, 2002, Whitney's attorney wrote to Swink and other Wal–Mart executives complaining that Whitney had been forced out of his job as TLE Manager in violation of laws forbidding discrimination against persons with disabilities. On February 28, 2002, Swink wrote a letter to Whitney advising him that his 12–week medical leave of absence had ended on February 27, 2002, and that because he was only permitted to work 40 hours per week with 2 consecutive days off, he did not meet the requirements to return to his job as TLE Manager in North Windham. Swink also advised Whitney in the letter that if he could not work the required hours and schedule, "Wal–Mart will help to reasonably accommodate you in helping find you another position within the company."

In response, Whitney sent a letter to Swink and enclosed a new note from his physician's assistant that loosened Whitney's work restrictions to 9 hours per day with two consecutive days off. In his letter, Whitney asked Swink to accommodate his medical restrictions by permitting him to work no more than 45 hours per week. He also asserted in his letter that, in his experience, TLE Managers can, with a few exceptions, complete their job duties in 40–45 hours per week. Because Whitney was able and willing to work 40–45 hours per week, Swink never considered Whitney to be substantially limited in a major life activity. Whitney concedes this point, acknowledging that Swink did not perceive any need to talk to Whitney about a reasonable accommodation because Swink did not view Whitney as substantially limited in a major life activity.

On March 14, 2002, Whitney remained out of work but was still being paid his regular salary as the TLE Manager at the North Windham Wal–Mart. On March 15, 2002, Swink telephoned Whitney to advise Whitney of a job opening in Wal–Mart's Falmouth store. Swink refused to talk to Whitney further about the TLE position in North Windham and Whitney did not make any effort to call Swink's supervisor to bring that to his attention. Whitney was offered a position as Inventory Control Specialist (ICS) at the Biddeford store because it met his medical restrictions, including the recommendation that Whitney have two consecutive days off. Whitney accepted the ICS position. According to Whitney, he accepted the ICS position reluctantly, because it was the only position discussed at the March 22 meeting that was within his medical restrictions.

On April 4, 2002, two DSD grocery receiver positions were posted in Wal–Mart's Biddeford store. Whitney applied for both and Vaillancourt and Pepin met with Whit-

ney to discuss his interest in the positions. According to Whitney, around May 4, 2002, Assistant Manager Pepin informed him that he would receive one of the jobs because he was the most qualified candidate. Whitney then reminded Pepin about his work restriction and Pepin indicated he would have to check with Vaillancourt since receivers normally take Wednesdays and Sundays off. At Whitney's May 2002 meeting with Vaillancourt and Pepin, Vaillancourt indicated that two consecutive days off would not work with the DSD receiver positions. It was Vaillancourt's decision to make and he did not hire Whitney. The fact that Whitney required two consecutive days off was a factor in Vaillancourt's decision to pass him over for the receiver positions.

During Whitney's tenure at the Biddeford store, a new store manager took over and invited Whitney to go into a department manager training program. Whitney indicated that he was interested, but also stated that he would prefer to pursue any such opportunities in the Scarborough or Falmouth stores, which are closer to his home. This was arranged and in July 2003 Whitney transferred from the Biddeford store to Wal–Mart's Scarborough store, taking a position on the ICS team there. While at Scarborough, the store manager there told Whitney to apply for two department manager positions (one in grocery and one in Department 82). Whitney did so and was hired to be manager of Department 82, where he continues to work to this day, despite his work restrictions. Whitney is not a salaried manager there, but currently earns $12.40 per hour.

### QUESTIONS OF LAW TO BE ANSWERED

Whitney brings this action under the Maine Human Rights Act, 5 M.R.S.A. § 4551, *et seq.* Whitney contends that the state statutory definition of "physical or mental disability" found at 5 M.R.S.A. § 4553(7–A) does not require the plaintiff to make a showing of a substantial limitation on a major life activity in order to be entitled to relief under the Act. He also maintains that the Maine Human Rights Commission Employment Regulation § 3.02(C)(1), which interprets the Maine Human Rights Act by supplementing the statutory definition with a requirement that a plaintiff demonstrate a substantial limitation on a major life activity before he or she obtains relief under the Act is an invalid regulation. Wal–Mart contends that the regulation is valid and that even in the absence of such a regulation, the Maine Human Rights Act, should be construed consistently with the ADA provision that qualifies the term "disability" to include only those disabilities or impairments that "substantially limit ... major life activities." 42 U.S.C. § 12102(2)(A).

If the Maine statutory provision requires a showing that plaintiff is substantially limited in a major life activity or if the regulation promulgated by the Maine Human Rights Commission is valid, this court will grant summary judgment to Wal–Mart on the undisputed facts. Thus the contentions of Wal–Mart, if correct, would be dispositive of the entire action.

In order for this court to adjudicate the motion for summary judgment now pending before it, the following questions of Maine law must be answered:

1. Does the Maine Human Rights Act definition of "physical or mental disability" found at 5 M.R.S.A. § 4553(7–A) require a showing of a substantial limitation on a major life activity as does its federal analogue, 42 U.S.C. § 12102(2)(A)?

2. Is Section 3.02(C) of the regulations adopted by the Maine Human Rights Commission, defining a "physical or mental impairment," invalid because it requires a showing of a substantial limitation on a major life activity?

In accordance with Maine Rules of Appellate Procedure 25(b), the court respectfully suggests to the Supreme Judicial Court of Maine sitting as the Law Court that the plaintiff be treated as the appellant before that Court.

So ORDERED.